UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MTS LOGISTICS, INC.,                              :

         Plaintiff,                                   :

  - against -                                              :

STONE TILE DIRECT, LLC,                       :

         Defendant.                               :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 27, 2012

10 Civ. 7312 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff MTS Logistics, Inc. ("Plaintiff"), a non-vessel operating common carrier (or "NVOCC"), sues Defendant Stone Tile Direct, LLC ("Defendant"), a natural stone importer, for damages arising from demurrage, detention, and related charges it incurred due to a misstated cargo weight.

Plaintiff moves for summary judgment, pursuant to Fed. R. Civ. P. 56. For the reasons that follow, Plaintiff's motion is GRANTED as to Defendant's liability and the amount of damages.

## BACKGROUND

In June 2010, Defendant purchased natural stone from a company in Konya, Turkey, by the name Lutfi Takavci Insaat Gida Endustri Tuketim Maddeler San. Ve Tic. Ltd. Sti. (the "Turkish Shipper"). (Def. 56.1 ¶ 1.) Defendant then retained Plaintiff's services, and Plaintiff booked an ocean carriage for the stone cargo with Mediterranean Shipping Company ("MSC").

(Pl. 56.1 ¶ 3.)[1]  On July 4, 2010, Plaintiff issued a bill of lading, which listed the Defendant as the "Consignee" and "Notify Party", the Turkish Shipper as the "Shipper," and which the Plaintiff signed as the "Carrier."  (Saka Decl. Ex. 3 (the Bill of Lading).)[2]  The Defendant does not dispute that it is bound by the Bill of Lading.

Clause 1 of the Bill of Lading provides that Merchants "shall be jointly and severally liable to the Carrier for the payment of all Charges, and for the performance of the obligations of any of them under the Bill of Lading" and defines "Merchants" as the "shipper, consignee, receiver, holder of this Bill of Lading, owner of the cargo or person entitled to the possession of the cargo and the servants or agents of any of these."  (Saka Decl. Ex. 3 pg. 3, ¶ 1.)  There is no dispute that Defendant qualifies as a Merchant under the Bill of Lading.

Clause 7 of the Bill of Lading provides that Merchants' responsibilities include "warrant[ing] to the Carrier that the description [and particulars of the Goods set out on the face hereof] . . . including, but not limited to, weight, content, measurement, quantity, quality, condition, marks, numbers and values are correct."  (Id. ¶ 7(a).)  Furthermore, the Bill of Lading provides that "[t]he Merchant shall indemnify the Carrier against all loss, damage, fines and expenses arising or resulting from the inaccuracies in, or inadequacy of, such particulars, and/or

---

[1] Defendant claims that Plaintiff was retained as a "freight forwarder" and Plaintiff contends it is a NVOCC.  There is a legal difference between the two:  A NVOCC typically "consolidate[s] cargo from numerous shippers into larger groups for shipment by an ocean carrier" and "issues a bill of lading to each shipper" so that "[i]f anything happens to the goods during the voyage the NVOCC is liable to the shipper because of the bill of lading that it issued."  Prima U.S. Inc. v. M/V Addiriyah, Her Engines, Boilers, Etc., 223 F.3d 126, 129 (2d Cir. 2000). A "freight forwarder" by contrast "simply facilitates the movement of cargo to the ocean vessel" and "does *not* issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped." Id.  Since Plaintiff issued a Bill of Lading, and thus had a contractual arrangement with the shipper and consignee, the Court will treat Plaintiff as a NVOCC rather than a freight forwarder.  See id. at 129 n.1 (recognizing that if a freight forwarder performs the functions of a carrier, "function would govern over form.")

[2] "A bill of lading evidences the receipt of goods for shipment" and "also operates as a document of title."  APL Co. Pte. Ltd. v. UK Aerosols Ltd., 582 F.3d 947, 952 (9th Cir. 2009) (citing U.C.C. § 1–201(b)(6)).

arising from any other clause in connection with the goods for which the Carrier is not responsible." (Id. ¶ 7(g).)

The Bill of Lading, on its face, reflected that the Turkish Shipper declared that the cargo weight to be 21,450 KGS. (Id. at 1 (indicating that the "Particulars furnished by Shipper").) The actual weight was later determined to be 60,880 lbs (or approximately 27,615 KGS). (See generally, Saka Decl. Ex. 5.) The Defendant does not dispute that the weight was inaccurately listed.

As a result of the understated weight, cable cranes were unable to safely discharge the stone cargo, leading to port demurrage and vessel detention charges. (Saka Decl. ¶ 6.) MSC passed these charges on to Plaintiff. (Id.) Plaintiff claims to have suffered either $15,811.98 or $17,731.88 in damages. (Compare Pl. Br. 8, with Saka Decl. ¶ 8.) Plaintiff's damages are comprised of: $3,370.00 in demurrage charges; $17,775.96, in vessel detention charges; $1,919.90 in survey fees (which collectively totals $23,065.86); less charges paid by another consignee for another overweight container (Saka Decl. ¶ 6).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court resolves all ambiguities and

draws all factual inferences in favor of the non-movant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

## ANALYSIS

### I. Defendant's Liability

While typically the "primary obligation to pay shipping costs rests with the shipper, rather than the consignee," the consignee can become liable for the shipping costs where it has a binding statutory or contractual obligation to pay the freight charges. Korea Express USA, Inc. v. K. K. D. Imps., Inc., No. 00-2940, 2002 U.S. Dist. LEXIS 27862, at *14 (D.N.J. Sept. 2, 2002); cf. In re M/V Rickmers Genoa Litig., 622 F.Supp.2d 56, 64, 70 n.17 (S.D.N.Y. 2009) (noting that courts under "common law have tended to reject buyer liability theories" but that "COGSA[3] does not *prohibit* binding such parties to bills of lading or prevent contracting parties from agreeing that buyers or consignees shall have the same rights and obligations as shippers under COGSA").

Plaintiff argues that Defendant is liable for the demurrage, detention, and related costs based on binding statutory and contractual obligations. Since Plaintiff raises meritorious theories of contract liability, the Court will not address Plaintiffs' theories of statutory liability, which are without merit.

Where a bill of lading provides for "freight collect" "the consignee is expected to pay the freight, and the carrier may refuse deliver till paid, exercising a lien for freight and charges." Sea-Land Serv., Inc. v. Andrew Corp., No. 88 C 8296, 1992 U.S. Dist. LEXIS 2092, at *10 (N.D. Ill. Feb. 25, 1992). There is no dispute that the Bill of Lading here provides for "freight collect" services, and, furthermore, explicitly provides that "freight charges" are to include "Detention and demurrage charges to be receiver's account." (Saka Decl. Ex. 3.) While the

---

[3] "COGSA" stands for to the Carriage of Goods by Sea Act.

contract does not define "receiver," having provided for "freight collect" services and listed "detention and demurrage" charges as part of the freight charges, it is clear that the Defendant, as named consignee, was contractually obligated to pay the freight costs and subsequent charges. See Sea-Land Serv., 1992 U.S. Dist. LEXIS 2092, at *10.  Plaintiff has thus demonstrated that Defendant has a contractual obligation to pay the detention and demurrage charges.

Additionally, and independently, the contract provides that "Merchants"—and there is no dispute that both the Defendant and the Turkish Shipper qualify as Merchants here—"shall be jointly and severally liable" for their "performance obligations" which include warranting that the cargo weight is correct.  (See Saka Decl. Ex. 3 pg. 3, ¶ 1, 7(a).)  There is no dispute that the cargo weight, as reflected in the Bill of Lading, was inaccurate.  Thus, Defendant, as a Merchant, is obligated to "indemnify the Carrier [for] all loss, damage, fines and expenses arising or resulting from [this] inaccurac[y]." (Id. ¶ 7(g).)

Defendant argues that the Merchant indemnification provision violates section 1304(3) of the Carriage of Goods by Sea Act ("COGSA"), which prevents a shipper from being held liable for damages sustained by a carrier without the "act, fault, or neglect of the shipper, his agents, or his servants." (Def. Opp. 6 (citing Excel Shipping Corp. v. Seatrain Int'l S.A., 584 F. Supp. 734, 747 (E.D.N.Y. 1984).)[4]  In Excel Shipping, the court held that a bill of lading provision that allowed the shipper and consignee to be held jointly liable for damage caused by the cargo, but that did not exempt the shipper from liability which stemmed from the carrier's negligence, conflicted with "COGSA provisions [that] are intended to limit the liability of a carrier only to the extent that another party is found negligent."  584 F. Supp. at 747.  The contractual provision

---

[4] Section § 1304(3) of COGSA provides, inter alia, that a "shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight, as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars." See 46 U.S.C. § 1304(3). While COGSA is now included as a note to 46 U.S.C. § 30701, the Court refers to the pre–2006 section numbers.

in Excel Shipping is distinguishable from a merchant indemnification provision that "does not attempt to relieve [the carrier] of [it's] liability for loss or damage due to its negligence." APL Co. PTE Ltd. v. UK Aerosols Ltd., 582 F.3d 947, 954-55 (9th Cir. 2009) (distinguishing Excel Shipping on this ground). Here, the Bill of Lading provides that a Merchant shall indemnify the Carrier for losses "for which the Carrier is *not* responsible." (Saka Decl. ¶ 7(g) (emphasis added).) Since the Plaintiff cannot be indemnified for damages that it is responsible for, the Merchant provision in the Bill of Lading does not violate section 1304(3).

Indeed, there is no evidence to suggest that the Plaintiff was negligent or was in any way responsible for the misstated cargo weight. There is sufficient evidence, however, to find the Turkish Shipper was negligent in misstating the cargo weight.[5] Accordingly, Plaintiff has demonstrated that the Defendant is also contractually obligated, as a Merchant, to indemnify Plaintiff for damages caused by the misstated cargo weight. See APL Co. PTE, 582 F.3d at 955 (finding that parties listed as "notify party" on bill of lading, who were not themselves negligent, were contractually liable as "merchants" to indemnify carrier for shipper's negligence).

## II. Damages

In Plaintiff's motion for summary judgment, it seeks $15,811.98 in damages (Pl. Br. 8). In Plaintiff's Rule 56.1 statement, it claims to have incurred $17,731.88 in damages. (Saka Decl.

---

[5] To demonstrate negligence under federal common law, courts consider the traditional common law elements: duty, breach, foreseeability, and causation. Peters v. Metro-North Commuter R. Co., No. 07 Civ. 1435(RLE), 2010 WL 3790720, at *7 (S.D.N.Y. Sept. 28, 2010). The Turkish Shipper had a duty under the Bill of Lading (and COGSA) to warrant that its representation regarding the cargo weight was accurate. (See Saka Decl. Ex. 3 pg. 3, ¶ 7(a); see also COGSA Section 1304(3)). The Turkish Shipper breached this duty by misstating the cargo weight by approximately 6,000 kilograms, which indisputably caused Plaintiff to suffer losses. See S.V. Braun, Inc. v. Alitalia-Linee Aeree Italiane, S.p.A., No. 91 Civ. 8484 (LBS), 1994 WL 121680, at *3-5 (S.D.N.Y. Apr. 6, 1994) (finding that a "misstat[ement] of weight of the shipment due to clerical error" was a sufficient breach to satisfy a negligence claim, and that without a doubt the misstatement caused Plaintiff's injury). Since the "detention and demurrage charges" were contemplated on the same page as the misstated weight on the Bill of Lading, it was reasonably foreseeable that a significant inaccuracy in the cargo weight would result in such charges.

¶ 8.)  Plaintiff claims that its damages are comprised of: $3,370.00 in demurrage charges; $17,775.96, in vessel detention charges; $1,919.90 in survey fees (which collectively totals $23,065.86); less charges paid by another consignee regarding another overweight container. (Saka Decl. ¶ 6 (citing Exs. 5-9).)  The Court grants judgment in the amount of $15,811.98, the amount stated in the Plaintiff's motion papers.  Plaintiff has not demonstrated its entitlement to the greater amount of damages incurred, but Defendant's liability is clear.

"The allowance of prejudgment interest in admiralty is committed to the trial court's discretion, although the Second Circuit has noted that it should be granted absent exceptional circumstances."  Fortis Corporate Ins., S.A. v. M/V Cielo del Canada, 320 F.Supp.2d 95, 107-08 (S.D.N.Y.2004)  Courts regularly award prejudgment interest in an amount based on the average annual United States Treasury Bill rate, because it "more closely parallels the income the damages would have earned in a short-term, risk-free investment."  Dessert Service Incorporated v. M/V MSC Jamie/Rafaela, 219 F.Supp.2d 504, 509 (S.D.N.Y.2002); see also Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 311 (2d Cir. 1987) (affirming the use of a Treasury Bill rate).  Since, "interest is intended as a cure for an actual loss of cash," it "should run from the time that the loss took place, which is the expected date of delivery."  Man Ferrostaal, Inc. v. M/V Akili, 763 F.Supp.2d 599, 614 (S.D.N.Y. 2011).  In this case, there are no extraordinary circumstances warranting a denial of prejudgment interest.  Accordingly, the Court awards Plaintiff prejudgment interest running from July 27, 2010 through March 27, 2012, at the average annual Treasury Bill rate, compounded annually.  Accord id.[6]

---

[6] See generally http: //www. treasury. gov/ resource- center/ data- chart- center/ interest- rates/ Pages/ Historic– Long Term– Rate– Data– Visualization. aspx (providing data on historical United States treasury bill rates); http://www.federalreserve.gov/Releases/H15/data.htm (providing monthly and annual rates).

With respect to Plaintiff's request for attorney's fees, "an indemnitee may recover from his indemnitor attorneys fees and expenses incurred in *defending* a claim as to which he is indemnified, he may not recover fees and expenses incurred to establish his right against the indemnitor," absent an explicit agreement otherwise. Peter Fabrics, Inc. v. S.S. Hermes 765 F.2d 306, 315-16 (2d Cir. 1985). A court also has the discretion in admiralty cases to award attorney's fees where a party offers "clear evidence that its adversary 'commenced or conducted an action in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Orient Overseas Container Line Ltd. v. Crystal Cove Seafood Corp., 2012 WL 463927, at *15 (S.D.N.Y. Feb. 14,2012). (quoting Dow Chem. Pac., Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 344 (2d Cir.1986)).

Plaintiff cannot collect attorney's fees under the indemnification provision because it is the indemnitee, who instituted this suit in order to be indemnified, and there is no specific contract provision allowing for its receipt of attorney's fees for such actions. Additionally, Plaintiff has not claimed, let alone offered clear evidence, that the Defendant acted in bad faith. Accordingly, Plaintiff's request for attorney's fees is denied.

Plaintiff's motion for summary judgment on its claim for damages is GRANTED in the amount of $15,811.98, plus prejudgment interest.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED. The Court finds the Defendant liable for the demurrage, detention, and related costs in the amount of $15,811.98, plus prejudgment interest running from July 27, 2010, at the average annual Treasury bill rate. Plaintiff's request for attorney's fees is DENIED.

The Clerk of the Court is directed to terminate this motion (Dkt. No. 10), and to calculate Defendants damages which amounts to $15,811.98, plus prejudgment interest at the average annual Treasury bill rate for the period from July 27, 2010 through March 27, 2012, compounded annually. The Clerk of the Court is then directed to close this case.

Dated: New York, New York
       March 27, 2012

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge